

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-26-2004

# Gambashidze v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-2218

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Gambashidze v. Atty Gen USA" (2004). *2004 Decisions.* Paper 348.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/348

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

IN THE UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 03-2218
_____

BESIK GAMBASHIDZE;
ANNA BZVANELI;
ANNA GAMBASHIDZE;
NIKOLOZ GAMBASHIDZE;
ZURAB GAMBASHIDZE;
BEKA GAMBASHIDZE,

*Petitioners*

v.

JOHN ASHCROFT, ATTORNEY
GENERAL OF THE UNITED STATES

Petition for Review of Orders of the
Board of Immigration Appeals
(Board Nos. A78-198-931, A78-198-932,
A78-198-933, A78-198-934,
A78-198-935, A78-198-936)

_____

Argued May 3, 2004

Before: SLOVITER, FUENTES and
BECKER, *Circuit Judges*

(Filed: August 26, 2004)

JON LANDAU (ARGUED)
ERICA S. GONZALEZ
Baumann, DeSeve & Landau
437 Chestnut Street

The Lafayette Building
Philadelphia, PA 19106

*Attorneys for Petitioners*

PETER KEISLER
Assistant Attorney General, Civil
Division
EMILY A. RADFORD
Assistant Director
LINDA S. WERNERY
ALLEN W. HAUSMAN
Senior Litigation Counsel
JOHN D. WILLIAMS
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, DC 20044

JONATHAN COHN (ARGUED)
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Attorneys for Respondent

_____

OPINION OF THE COURT
_____

BECKER, Circuit Judge.

Besik Gambashidze, a native of the
Republic of Georgia, petitions for review
of a decision of the Board of Immigration
Appeals (BIA) denying him withholding
of removal. The applications of his wife,
Anna, and their four children are

dependent on his application. This case requires us to address for the first time a recently codified regulation, 8 C.F.R. § 208.16(b)(1)(i)(B), which controls how the possibility of relocation within the proposed country of removal affects the claim of an alien who seeks withholding of removal based on past persecution.

Gambashidze was politically active in Georgia in the 1990s following its independence from the Soviet Union in 1991, ultimately joining a group known as the Round Table, which opposed Georgian President Eduard Shevardnadze. For this activity, Gambashidze was allegedly persecuted by the police, both in Tbilisi (the capital of Georgia) and in his hometown of Rustavi, a city thirty-five kilometers southeast of Tbilisi. The persecution lasted from early 1996 to mid-1997, at which time Gambashidze and his family moved to another home in Tianeti, a city fifty kilometers north of Tbilisi. Details of his stay in Tianeti are scant, but he did not encounter the police in his eight months there.

In early 1998, Gambashidze came to the United States on a tourist visa, and the rest of his family followed over the next eighteen months. Gambashidze applied for various forms of relief to avoid being removed to Georgia, but was unsuccessful on all claims before the immigration judge (IJ) and on appeal before the BIA. On this petition for review he challenges only the BIA's disposition of his claim for withholding of removal. The BIA assumed, *arguendo*, that Gambashidze had demonstrated past persecution, and was therefore entitled to a presumption of a likelihood of future persecution. *See* 8 C.F.R. § 208.16(b)(1)(i). The Board nonetheless held him ineligible for withholding of removal because he had "not met his burden of proof in demonstrating that he has a well founded fear of persecution upon return to Georgia because he and his family were able to internally relocate and live unmolested for several months prior to entering the United States."

The BIA invoked 8 C.F.R. § 208.16(b)(1)(i)(B) to reach this result. The regulation envisions a two-part inquiry: whether relocation would be a *successful* means of escaping persecution, and whether relocation would be *reasonable*. While there is ample evidence that it would be reasonable for Gambashidze to relocate to Tianeti, the record discloses next to nothing about the true viability of Tianeti as persecution-free zone for Gambashidze. Since the burden of proof in an internal-relocation rebuttal is on the government, 8 C.F.R. § 208.16(b)(1)(ii), the slim record on this critical point cannot support the BIA's decision. Because there is not substantial evidence in the administrative record for the BIA's conclusion regarding internal relocation, we will grant the petition for review.

## I. The Administrative Record and the BIA's Decision

The administrative record consists principally of Gambashidze's live

2

testimony before the IJ, very brief live testimony by his wife, the State Department's 1999 Country Report on Georgia (the "Country Report"), and the affidavits and statements submitted by Gambashidze in connection with his application. Since neither the IJ nor the BIA rested their decisions on information in the Country Report, we will not discuss it. As for Gambashidze's testimony and written submissions, the IJ found him not credible, but the BIA did not rest its decision on credibility grounds; therefore, for ease of exposition we will present Gambashidze's testimony as truthful.

A. Gambashidze's Testimony

As we have already noted, Gambashidze was politically active as an opponent of Georgian President Eduard Shevardnadze. Gambashidze had been a supporter of Georgia's first post-Soviet president, Zviad Gamsakhurdia, who was removed after less than a year in office in the coup d'état that resulted in Shevardnadze's control of Georgia. Gambashidze remained loyal to pro-Gamsakhurdia factions, and opposed Shevardnadze; this political activity consisted mainly of his membership and participation in a group known as the Round Table. He participated in Round Table demonstrations and rallies and gave the group financial assistance.

Gambashidze's testimony and written submissions do not suggest that he was persecuted for his political activity from 1991 to 1995, but a series of encounters with police based on his Round Table activity began in 1996. In February 1996, he participated as a speaker at a rally in Tbilisi, representing his hometown of Rustavi. A large number of police broke up the demonstration, and Gambashidze was taken to police headquarters. There, he was beaten on his feet and stomach and released after five hours. Then, in July of 1996, Gambashidze was summoned to police headquarters in Rustavi, where he was warned to cease participating in demonstrations. He did not.

In September, four Rustavi policemen came directly to his house at night and took him away; he was beaten on his feet, and again told to stop participating in Round Table demonstrations. Gambashidze's wife corroborated his account of the police coming to the house, and the foot injury that Gambashidze sustained. In March of 1997, while on a visit to Tbilisi, Gambashidze was apprehended by a police patrol and brought to police headquarters. He was handcuffed to a pipe and beaten, and again warned to stop participating in political demonstrations. Two months later, in May 1997, police took him from his house in Rustavi to the Rustavi office of the Ministry of Internal Affairs, where a high-ranking official tried to force him to confess to participation in a recent attempt to assassinate President Shevardnadze. Gambashidze claimed he had no involvement and would not confess; he was severely beaten and the Internal Affairs official threatened him and his family.

At this point, in Gambashidze's words,

3

he "had reached the edge. . . . I started making ready to get out of Georgia." The family moved to a summer house owned by Gambashidze's wife in Tianeti. While Gambashidze lived there—from May 1997 until January 1998—he had no incidents with the police. He was able to make at least one trip to Tbilisi (to obtain a visa from the American embassy) without being stopped by the police. While none of Gambashidze's family had trouble with the police in Tianeti, after Gambashidze left for the United States in January 1998 police inquired of his mother as to his whereabouts. It is not entirely clear whether Gambashidze continued his political activity while in Tianeti. He did not specifically testify that he engaged in political demonstrations while he was living in Tianeti, but in response to a general question at the beginning of his testimony, "For how many years did you engage in those political demonstrations?" he answered, "I would say up to '98."

Gambashidze and his family came, two at a time, to the United States during 1998 and 1999. He applied in late 1999 for various forms of relief that would allow him and his family to remain in the United States.

### B. The IJ's Decision and the BIA's Affirmance

The IJ rejected all of Gambashidze's claims on various and multiple grounds, most of which do not concern us here since Gambashidze has petitioned for review of only the denial of his claim for withholding of removal. The IJ denied him relief on that claim on two grounds: first, that he had not supported his claim with credible testimony, and second, that even taking his testimony as true, Gambashidze's accounts of his life in Georgia did not establish past persecution or any probability of future persecution. The BIA affirmed in a one-paragraph per curiam opinion, in which it advanced a different ground for denying the claim for withholding of removal: that Gambashidze could avoid any future persecution by relocating within Georgia. Specifically, the BIA stated:

> [W]e find that the respondent failed to meet his burden of proof in demonstrating that he suffered past persecution or has a well founded fear of persecution upon return to Georgia. Specifically, the respondent has not met his burden of proof in demonstrating that he has a well founded fear of persecution upon return to Georgia because he and his family were able to internally relocate and live unmolested for several months prior to entering the United States.

We have jurisdiction under 8 U.S.C. § 1252 over this timely petition for review of this final determination of the BIA.

### II. Discussion

### A. Standard of Review

The BIA concluded that because Gambashidze and his family "were able to internally relocate and live unmolested for

several months," they could therefore "avoid a future threat to . . . life or freedom by relocating to another part of the proposed country of removal," 8 C.F.R. § 208.16(b)(1)(i)(B). We review such a finding of fact under 8 U.S.C. § 1252(b)(4)(B), which provides that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." As the *en banc* Court explained in *Dia v. Ashcroft*, we "have read this standard to require that the agency support its findings with substantial evidence, as articulated by the Supreme Court in *INS v. Elias-Zacarias*, 502 U.S. 478, 481-84 [(1992)]." 353 F.3d 228, 247 (3d Cir. 2003) (en banc); *see also Sevoian v. Ashcroft*, 290 F.3d 166, 171 (3d Cir. 2002) ("[The Illegal Immigration Reform and Immigrant Responsibility Act] codifies the language the Supreme Court used in *Elias-Zacarias* to describe the substantial evidence standard in immigration cases."). We concluded in *Dia* that

> the question whether an agency determination is supported by substantial evidence is the same as the question whether a reasonable fact finder could make such a determination based upon the administrative record. If a reasonable fact finder could make a particular finding on the administrative record, then the finding is supported by substantial evidence. Conversely, if no reasonable fact finder could make

> that finding on the administrative record, the finding is not supported by substantial evidence.

353 F.3d at 249.

B. Analysis of Gambashidze's Claim

Gambashidze petitions for review of the BIA's denial of his claim for withholding of removal. Under 8 U.S.C. § 1231(b)(3)(A), "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." To qualify for withholding of removal, an alien "must show a clear probability that upon his return to [the country of removal]" he would be persecuted. *Li Wu Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001) (citing *Chang v. INS*, 119 F.3d 1055, 1066 (3d Cir. 1997)). "Put differently, the standard is that he must show that it is more likely than not that he will face persecution if he is deported." *Id.* at 244 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987)). As is familiar, an alien who has demonstrated past persecution is presumed to face future persecution if removed. *See* 8 C.F.R. § 208.16(b)(1)(i). The same regulation also codifies certain ways in which the government may rebut this presumption of future persecution. Here we consider one such avenue, 8 C.F.R. § 208.16(b)(1)(i)(B), which contemplates that it may be reasonable for an alien to relocate within the country of removal to

5

avoid future persecution.

The regulation provides that the presumption of future persecution may be rebutted upon a finding that "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." *Id.* The IJ must make such a finding by the preponderance of the evidence, 8 C.F.R. § 208.16(b)(1)(i), and—of some significance for the case now before us—the burden of proof is on the government, 8 C.F.R. § 208.16(b)(1)(ii). In assessing the reasonableness of internal relocation, the regulation directs adjudicators to consider "among other things, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 208.16(b)(3). The regulation envisions a totality of the circumstances inquiry, noting that "[t]hese factors may or may not be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate." *Id.*

The notion of the internal-relocation rebuttal has existed for some time in the BIA's decisions, *see, e.g.*, *Matter of C—A—L—*, 21 I. & N. Dec. 754 (BIA 1997), but the regulation was not codified into its present form until relatively recently, *see* 65 Fed. Reg. 76135 (Dec. 6, 2000). The regulation was effective January 5, 2001, which is after the date of the IJ's decision. Nonetheless, the regulation was in effect by the time of the BIA's decision, and the BIA expressly cited the new regulation in its decision.

As the internal-relocation regulation is a fairly recent codification, this Court has not had occasion to address it in any detail. Indeed, while several Courts of Appeals have mentioned the regulation in passing, it appears that only the Court of Appeals for the Ninth Circuit has considered it at any length.[1] In *Knezevic v. Ashcroft*, 367 F.3d 1206 (9th Cir. 2004), that Court took up the case of a septuagenarian ethnic Serb and his ethnic Serb wife, both from Bosnia-Herzegovina. The Court determined, contra the IJ in that case, that

---

[1]One other Court of Appeals case, *Hagi-Salad v. Ashcroft*, 359 F.3d 1044 (8th Cir. 2004), considers 8 C.F.R. § 208.13(b)(1)(i)(B), which is the internal-relocation regulation used in adjudicating asylum claims. It is virtually identical to 8 C.F.R. § 208.16(b)(1)(i)(B), which is used in adjudicating withholding of removal claims and applications for relief under the Convention Against Torture. *Hagi-Salad* is not instructive here, though, because the BIA decision under review in that case wholly misinterpreted the regulation, leaving the Court of Appeals with little to do but grant the petition and remand the case for proper consideration.

6

the couple had demonstrated past persecution at the hands of Croatians in the region. *See id.* at 1211-12. It turned therefore to the IJ's alternative basis of decision—that the Knezevics could avoid future persecution by relocating within Bosnia-Herzegovina. The Court concluded that "[t]he evidence . . . indicates that the Knezevics could safely relocate to the Serb-held parts of Bosnia-Herzegovina without fear of the Croats or Muslims." *Id.* at 1214. Nonetheless, the Court concluded that it would be unreasonable to require them to do so:

> If forced to relocate, [the Knezevics] would have great difficulty finding employment, and the destruction of their business and loss of all their possessions means they would have no means of supporting themselves. Additionally, their family members no longer reside in Bosnia-Herzegovina.
>
> . . . . To expect the Knezevics to start their lives over again in a new town, with no property, no home, no family, and no means of earning a living is not only unreasonable, but exceptionally harsh.

*Id.*

Thus the regulation envisions a two-part inquiry: whether relocation would be *successful*, and whether it would be *reasonable*. Under 8 C.F.R. § 208.16(b)(1)(ii), the burden of proof on both issues is on the government. In any given case, of course, only one of these questions may be at issue.[2] In Gambashidze's case, for example, it is undisputed that it would be reasonable for him and his family to relocate to their house in Tianeti; after all, the family is apparently relatively well-to-do, Tianeti is not a great distance from Rustavi, and the family did in fact relocate to Tianeti for eight months from mid-1997 to early 1998. Gambashidze does take issue, however, with the BIA's conclusion that he could successfully avoid persecution by

---

[2]Courts have undertaken—in full or in part—this same bipartite inquiry even in cases decided prior to the codification of the internal-relocation regulation (i.e., cases decided under *Matter of C—A—L—*). *See, e.g.*, *Melkonian v. Ashcroft*, 320 F.3d 1061, 1069-71 & n.3 (9th Cir. 2003) (noting new internal-relocation regulations and vacating IJ's decision on the ground that while he assessed whether internal relocation within the Republic of Georgia would be successful, he failed to address whether it would be reasonable); *Manzoor v. United States Dep't of Justice*, 254 F.3d 342, 347-48 (1st Cir. 2001) (overturning BIA decision on the ground that substantial evidence did not show that relocation within Pakistan would allow applicant to escape persecution); *Singh v. Ilchert*, 63 F.3d 1501, 1510-12 (9th Cir. 1995) (overturning BIA decision on the ground that persecution of applicant by government actors in India presumptively made his relocation within India futile).

relocating to Tianeti.

Gambashidze challenges the BIA's conclusion that he "has not met his burden of proof in demonstrating that he has a well founded fear of persecution upon return to Georgia because he and his family were able to internally relocate and live unmolested for several months prior to entering the United States." Preliminarily, we must note that this seems to be a misstatement of the law, for upon demonstrating past persecution (which the BIA must have assumed here, since it offered no comment on past persecution), an applicant is presumed to face future persecution and the burden shifts to the government in rebuttal. *See* 8 C.F.R. § 208.16(b)(1)(i)-(ii). The BIA's decision could be read to have (incorrectly) placed the burden on Gambashidze. We will, however, indulge the view that the BIA's statement is simply a shorthand for saying that Gambashidze failed to prevail on his ultimate burden to show a likelihood of future persecution because the government carried its burden on its internal-relocation rebuttal.

Thus the question is whether substantial evidence supports the conclusion that Gambashidze could avoid persecution in Georgia by relocating to Tianeti. All we know from the record is that Gambashidze was able to live unmolested in Tianeti for about eight months, during which time he may have engaged in some political activity, but we know no other details. The record does not disclose whether he was able to live freely in Tianeti, or had to remain in hiding underground. We do not know whether his persecutors knew that he had relocated. There is evidence of only one trip into Tbilisi, where he had been previously seized by police, but one trip to a large city (Tbilisi had well over one million inhabitants in 1997) is not likely to attract the notice of the authorities. Moreover, an eight-month period without police persecution under these circumstances is extremely weak evidence that persecution had ceased entirely. While he was living in Rustavi, Gambashidze's encounters with the police came at intervals of 2 to 7 months, so an 8-month hiatus while he was in Tianeti, perhaps in hiding, is not enough of an outlier to suggest that the pattern of persecution had ended.

Overall, the record says virtually nothing about whether moving his family to Tianeti would be a successful way for Gambashidze to permanently avoid his persecutors. To be sure, what little evidence there is in the record is consistent with the government's position. But the record is so thin on the very matter that formed the basis of the BIA's decision that no reasonable factfinder could soundly reach the conclusion that the BIA did on the limited evidence before it. The burden is on the government, and we are compelled to conclude that the government did not meet that burden.

## III. Conclusion

For the foregoing reasons, we will grant the petition for review. On remand,

the government is of course free to more fully develop the factual basis for its internal-relocation position, or to urge the BIA to rest its decision on some other ground. We also note that the administrative record in this case, like so many others this Court has recently seen, is way out of date—both chronologically and in terms of actual events on the ground in Georgia. The testimony in this case is over fifty months old, the most recent State Department Country Report in the administrative record is older still, and the political climate in Georgia seems to have undergone a sea change since the ouster of Shevardnadze in late 2003. Perhaps on remand the parties can heed the concerns we recently expressed about stale administrative records in *Berishaj v. Ashcroft*, No. 03-1338, 2004 WL 1746299 (3d Cir. Aug. 5, 2004).